1    **WO**

2

3

4

5

6            **IN THE UNITED STATES DISTRICT COURT**

7            **FOR THE DISTRICT OF ARIZONA**

8

9    Brenna Bullock,                          No. CV-24-00520-TUC-SHR

10                    Plaintiff,              **Order Granting TRO and Order to Show Cause**

11    v.

12    Arizona Board of Regents, et al.,

13                    Defendants.

14

15

16            Pending before the Court is Plaintiff's "Application for Temporary Restraining

17    Order and Preliminary Injunction (With Notice)" ("TRO Motion") (Doc. 2) filed pursuant

18    to Federal Rule of Civil Procedure 65 on October 24, 2024. (*See also* Doc. 10 (providing

19    proof of service on Defendant Arizona Board of Regents).) Also pending is Plaintiff's

20    "Application for Order to Show Cause Regarding Issuance of an Injunction." (*Id.*)

21    Defendants have not responded. For the reasons stated below, the Court will grant

22    Plaintiff's TRO Motion and issue an Order to Show Cause.

23            **I.        BACKGROUND**

24            Plaintiff began her residency in the University of Arizona College of Medicine's

25    Ophthalmology Residency Program (the "Program") in July 2021. (Doc. 1 at 2–3.)

26    Plaintiff was the only female resident in her Program year. (*Id.* at 3.) Plaintiff expected to

27    graduate from the Program in 2025 and planned to apply for a vitreoretinal surgery

28    fellowship. (*Id.*) She had "never received complaints or had any issues in the Program,"

1    and instead had received only positive feedback regarding her professionalism and

2    interpersonal, clinical, and surgical skills.  (*Id.* at 3, 5; Doc. 2 at 3–4.)

3    In April 2023, during her fourth year in the Program, Plaintiff first expressed

4    concerns to her program supervisor, Defendant Todd Altenbernd, M.D., about receiving

5    fewer surgical training opportunities than the male students in her Program year and other

6    "general disparate treatment."  (Doc. 1 at 2, 3; Doc. 2 at 2–3.)  Altenbernd did not address

7    Plaintiff's concerns, and Plaintiff continued to raise issues of sex discrimination in her

8    Program, alleging, among other things, several physicians had suggested she should pursue

9    a non-surgical specialty based on her gender, while others had "excluded her from

10    education and training opportunities," instead "focusing their efforts on [her] male peers."

11    (Doc. 1 at 4–5; Doc. 2 at 3.)

12    On June 12, 2023, "immediately after [Plaintiff] complained to a faculty member

13    that she was receiving fewer surgical opportunities," Defendant Altenbernd placed Plaintiff

14    on administrative leave and required her to undergo a behavioral health evaluation.  (Doc.

15    1 at 5; Doc. 2 at 3.)  No deficits in Plaintiff's performance were communicated to her and

16    she "was not placed on any sort of performance improvement plan (PIP), probation, or

17    remediation."  (Doc. 1 at 6.)  Plaintiff returned to her clinical duties in July 2023 and was

18    treated with hostility "for her gender discrimination complaint."  (Doc. 1 at 6; Doc. 2 at 4.)

19    After raising this issue with Defendants Altenbernd and Jonathan Holmes, M.D., they

20    informed Plaintiff she would be dismissed from the Program if she continued to complain

21    and "began to accuse [her] of unprofessional behavior and unwillingness to accept

22    feedback in response to her attempts to explain her position or when she asked questions

23    for clarification."  (Doc. 1 at 6; Doc. 2 at 4.)  In July, Plaintiff received her "first negative

24    evaluation for two professionalism milestones from" Holmes based on "a report of

25    discrimination she experienced in a prior rotation."  (Doc. 1 at 6–7; Doc. 2 at 4.)  Despite

26    working with four faculty members "while on her inpatient consult rotation"—two of

27    whom had previously given Plaintiff positive evaluations—she "only received evaluations

28    from" Altenbernd and Holmes, who "had already targeted and retaliated against" her.

1    (Doc. 1 at 7; Doc. 2 at 4.)

2        In November 2023, Plaintiff met with Defendant Conrad Clemens, M.D.—the

3    Designated Institutional Officer—to report ongoing gender discrimination and retaliation.

4    (Doc. 1 at 8.)  Clemens recommended Plaintiff submit a report to the University's Office

5    of Institutional Equity (OIE) but did not make any such reports himself.  (*Id.*)  After this

6    meeting, Plaintiff again experienced increased "discriminatory and retaliatory behavior

7    from faculty and staff in the Program."  (*Id.*)  While on rotation with another physician,

8    Plaintiff was subjected to "repeated belittlement, intimidation, and exclusion from training

9    opportunities."  (*Id.*)  The physician told her she "should expect this treatment from faculty

10   due to her reputation" for raising gender discrimination concerns.  (*Id.*)  During a December

11   meeting with Defendant Holmes, he berated Plaintiff and called her "stupid" and an "idiot."

12   (*Id.*)  Later that month, Plaintiff emailed the OIE "to inquire about submitting a complaint

13   and stated her fear of further retaliation should she submit a complaint."  (*Id.* at 9.)

14       In January 2024, the day after Plaintiff filed two complaints against trauma service

15   residents for pressuring her to "perform procedures on intoxicated and violent patients,"

16   Defendant Altenbernd arranged a meeting with Plaintiff to discuss an "action plan."  (Doc.

17   1 at 9.)  At the meeting on January 11, Altenbernd gave Plaintiff a "letter of concern" and

18   informed her for the first time that she was deficient in meeting her competency milestones.

19   (*Id.*)  Plaintiff responded she believed the letter of concern was "in retaliation for her recent

20   complaints to Dr. Clemens, her stated intent to file a complaint with the OIE, and reporting

21   professionalism complaints and safety issues."  (*Id.*)  Later that day, Altenbernd called

22   Plaintiff and placed her on administrative leave, subsequently providing an official letter

23   stating the "leave was necessary to review her statements that she felt unsafe in the

24   workplace."  (*Id.* at 9–10.)

25       In February 2024, after approximately three weeks of leave, Plaintiff was required

26   to undergo a psychiatric evaluation.  (Doc. 1 at 10.)  The psychiatrist, who had received a

27   report from Defendant Altenbernd before evaluating Plaintiff, deemed her "unfit for duty."

28   (*Id.*)  Later that month, Plaintiff was informed she would be required to undergo therapy

1   with a psychiatrist before returning to work.  (*Id.* at 11.)  Plaintiff complied with this

2   requirement and returned to work in April 2024.  (*Id.*)  Upon her return, she was subjected

3   to a one-month informal evaluation period, during which she worked "more than 85 hours

4   per week" and was "placed on excessive primary call" to "make up" for the call she had

5   missed while on medical leave.  (*Id.* at 11–12; Doc. 2 at 7.)  Altenbernd required Plaintiff

6   to achieve certain ratings on faculty evaluations during this period, and Plaintiff met this

7   requirement on all evaluations except those from Defendants Altenbernd and Holmes.

8   (Doc. 1 at 12.)

9        Following the evaluation period, Plaintiff continued her clinical assignment and

10  received positive feedback from other faculty.  (Doc. 1 at 12.)  On June 5, 2024, Plaintiff

11  performed her first cataract surgery entirely on her own.  (*Id.*)  On June 6, Defendants

12  Altenbernd and Holmes met with Plaintiff and issued a Notice of Recommended

13  Disciplinary Action (the "Notice") informing Plaintiff the Program was "considering

14  dismissal due to allegations of unprofessional conduct."  (*Id.*)  The Notice identified

15  complaints "primarily based on nonclinical interactions," such as Plaintiff's "email

16  communications with" Altenbernd and Holmes.  (*Id.*)  Although Plaintiff had been

17  informed complaints dated prior to the evaluation period would not be used in judging her

18  progress going forward, the Notice referred to several old complaints.  (*Id.* at 13.)  Plaintiff

19  appealed the Notice to the Clinical Competency Committee and presented a statement to

20  contest the recommended dismissal.  (*Id.*)  Holmes, the Chair of the Department of

21  Ophthalmology, was present at the meeting.  (*Id.* at 2, 13.)

22       On June 26, 2024, Defendant Altenbernd issued a Notice of Final Disciplinary

23  Action dismissing Plaintiff from the Program.  (Doc. 1 at 13.)  Plaintiff appealed to

24  Defendant Clemens, asserting, among other things, Altenbernd had acted in retaliation "for

25  concerns raised by [Plaintiff] throughout her time in the Program."  (*Id.*)  Plaintiff asked

26  Clemens to obtain an "advisory opinion" from the Graduate Medical Education Committee

27  (GMEC), and GMEC issued an advisory opinion recommending reversal of Plaintiff's

28  dismissal from the Program.  (*Id.* at 13–14.)  On August 12, 2024, Clemens issued a

1    decision reversing Plaintiff's dismissal, noting she had not been afforded a sufficient

2    opportunity to remediate the deficiencies identified in the Notice. (*Id.*) Plaintiff asked

3    Clemens to allow her to participate in a non-disciplinary PIP, but Clemens instead imposed

4    a six-month probationary period that would appear on her permanent record, be disclosed

5    to future employers, and be reported to the Arizona Medical Board. (*Id.*) Clemens had

6    offered Plaintiff an alternative option requiring her to take an additional six months of leave

7    to avoid probation, but, based on "the significant gaps in her training resulting from

8    medical leave and the 3 month-long dismissal appeal process," she "elected to return

9    immediately but attempted to negotiate probation terms prior to doing so." (*Id.*)

10        Between August 12 and September 9, 2024, the parties' counsel communicated

11   about Plaintiff's return to the program and revision of the probation terms. (Doc. 1 at 14.)

12   Specifically, Plaintiff questioned the need for probation as she had never undergone a non-

13   disciplinary remediation or PIP to address the alleged deficiencies and asked that a member

14   of the GMEC be assigned to act as her mentor to help her successfully complete the

15   Program. (*Id.* at 15.) On August 26, 2024, Defendant Altenbernd issued a letter outlining

16   the terms of Plaintiff's probation, including that she work directly with, and be evaluated

17   by, Altenbernd. (*Id.*) The terms also provided Plaintiff would be retained as a third-year

18   resident for four months despite being in her fourth year of residency, and her six-month

19   probationary period would not be considered towards the requirements for medical board

20   eligibility. (*Id.*)

21        Plaintiff was scheduled to return to the Program on September 1, 2024. (Doc. 1 at

22   15.) Before her return, Plaintiff informed Defendant Clemens she was concerned about

23   retaliation by Defendant Altenbernd. (*Id.*) On August 30, Clemens informed Plaintiff her

24   administrative leave would be extended while her concerns were investigated and

25   requested she provide a statement addressing her specific concerns about working with

26   Altenbernd. (*Id.* at 16.) On September 6, Plaintiff provided the requested information

27   along with a list of questions regarding her return to the Program. (*Id.*) On September 9,

28   Clemens issued a second Final Decision rescinding the offer for Plaintiff to return on

1   probation and upholding Altenbernd's dismissal decision because Plaintiff had questioned

2   the probation terms.  (*Id.*)  Plaintiff requested to appeal the decision, and Clemens denied

3   her request.  (*Id.*)  On October 2, Plaintiff filed claims of sex discrimination and retaliation

4   for reporting gender discrimination with the Arizona Civil Rights Division, the Equal

5   Employment Opportunity Commission, and the OIE.  (*Id.*)

6          On October 24, 2024, Plaintiff filed a Complaint in this Court, asserting claims of

7   sex discrimination and retaliation under Title IX against Defendant ABOR and claims of

8   violations under 42 U.S.C. § 1983 against Defendants Altenbernd, Holmes, and Clemens.

9   (Doc. 1 at 17, 18.)  The same day, Plaintiff filed the instant TRO Motion asking the Court

10  to temporarily enjoin the University and its faculty "from imposing [her] dismissal . . . from

11  the University's medical resident program" and "from further discriminati[ng] and

12  retaliati[ng] against" her.  (Doc. 2 at 1.)

13  **II.     JURISDICTION**

14         Because this case raises federal questions under 42 U.S.C. § 1983 and Title IX, this

15  Court has original jurisdiction pursuant to 28 U.S.C. § 1331.

16  **III.    LEGAL STANDARD**

17         A TRO is "an extraordinary remedy that may only be awarded upon a clear showing

18  that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S.

19  7, 22 (2008); *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839

20  n.7 (9th Cir. 2001) (noting TROs are analyzed in substantially the same way as preliminary

21  injunctions).  A plaintiff seeking a TRO must establish: (1) she is likely to succeed on the

22  merits; (2) she is likely to suffer irreparable harm in the absence of preliminary relief; (3)

23  the balance of equities tips in her favor; and (4) an injunction is in the public interest.

24  *Winter*, 555 U.S. at 20.  The court is to apply a "sliding scale" approach to these factors; a

25  strong showing of one element may offset a weaker showing of another.  *hiQ Labs, Inc. v.*

26  *LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022).  When the government is a party, the

27  last two of the four factors—the balance of the equities and the public interest—merge.

28  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  The first factor,

1   likelihood of success on the merits, is "the most important" *Winter* factor.  *Disney Enters.,*

2   *Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *Garcia v. Google, Inc.*,

3   786 F.3d 733, 740 (9th Cir. 2015) (en banc)).  However, in the Ninth Circuit, a temporary

4   restraining order is also warranted where "serious questions going to the merits" exist and

5   a "hardship balance . . . tips sharply toward the plaintiff"—provided the other two elements

6   of the *Winter* test are also met.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132

7   (9th Cir. 2011); *see also Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th

8   Cir. 2013) (describing serious questions going to the merits as "a lesser showing than

9   likelihood of success on the merits").  Regardless of which standard applies, the movant

10   carries the burden of proof on each element of either test.  *See Los Angeles Mem'l Coliseum*

11   *Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200–01 (9th Cir. 1980).

12         Injunctive relief—whether obtained by TRO or preliminary injunction—can be

13   classified into two categories:  mandatory or prohibitory.  A mandatory injunction

14   commands a party to do some positive act, while a prohibitory injunction prohibits a party

15   from engaging in further acts and "preserve[s] the status quo pending a determination of

16   the action on the merits."  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,

17   571 F.3d 873, 878–79 (9th Cir. 2009) (alteration in original) (citation omitted).  The "status

18   quo" refers to "the legally relevant relationship between the parties before the controversy

19   arose."  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014); *see*

20   *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (describing the

21   status quo as "the last uncontested status which preceded the pending controversy" (citation

22   omitted)).  Because a mandatory injunction alters the status quo, a request for mandatory

23   injunctive relief "is subject to heightened scrutiny and [the injunction] should not be issued

24   unless the facts and law clearly favor the moving party."  *Dahl v. HEM Pharms. Corp.*, 7

25   F.3d 1399, 1403 (9th Cir. 1993).  Indeed, when "a party seeks mandatory preliminary relief

26   that goes well beyond maintaining the status quo," the Ninth Circuit has warned courts to

27   "be extremely cautious."  *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 675 (9th Cir.

28   1984).

1    As a preliminary matter, Plaintiff contends her reinstatement in the Program is

2  necessary to maintain the "status quo." (Doc. 2 at 9.)  Plaintiff asserts the "status quo" is

3  her "enrollment in the Program . . . before Defendant dismissed her." (Doc. 2 at 70.)  The

4  Court agrees.  When granting prohibitory relief, a court can still order a party to take certain

5  affirmative actions required to reinstate the status quo.  *See, e.g.*, *GoTo.com*, 202 F.3d at

6  1210 (affirming preliminary injunction enjoining Disney from using infringing logo and

7  finding the status quo "existed before Disney began using its allegedly infringing logo").

8  As such, the Court finds Plaintiff seeks a prohibitory injunction.

9    **IV.    DISCUSSION**

10   **A.  Likelihood of Success**

11   The first step in determining whether Plaintiff is entitled to injunctive relief requires

12  only that she demonstrate "a fair chance of success" on the merits of her claims.  *Republic*

13  *of the Phil. v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc) (citation omitted).

14  At a minimum, and only if Plaintiff also demonstrates the "hardship balance" tips in her

15  favor, Plaintiff must demonstrate "serious questions going to the merits" of her claim.  *All.*

16  *for the Wild Rockies*, 632 F.3d at 1131–32.  Plaintiff argues she is likely to succeed on the

17  merits of both of her claims under Title IX:  sex discrimination and retaliation.  The Court

18  considers each in turn.

19   **1.  Sex Discrimination**

20   Title IX is a broad-reaching statute prohibiting a recipient of federal education

21  funding from discriminating based on sex, which encompasses intentional discrimination,

22  deliberate indifference, and sexual harassment.  *Jackson v. Birmingham Bd. of Educ.*, 544

23  U.S. 167, 173–74 (2005) (citing 20 U.S.C. § 1681(a)).  To prevail on a Title IX sex

24  discrimination claim, a plaintiff need only show (1) the educational institution received

25  federal funding, (2) the plaintiff was excluded from participation in or denied the benefits

26  of an educational program, and (3) the educational institution in question discriminated

27  against the plaintiff on the basis of gender.  *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940,

28  947 (9th Cir. 2020).

1        Here, Plaintiff alleges the University of Arizona receives federal funding, pointing

2    to the Title IX Non-Discrimination Statement available on the University's website. (Doc.

3    2 at 10.) Plaintiff asserts she received "fewer surgical training opportunities" than the male

4    students in the Program, resulting in deficiencies in her "case log numbers for oculoplastic

5    surgery, cataract surgery, anterior and posterior segment lasers, and glaucoma surgery,

6    which male residents in the same year do not have," and, absent an injunction, she will be

7    completely "excluded from the benefits of an educational program." (*Id.* at 2–3, 10)

8    Plaintiff further claims (1) a supervising physician told her she "should choose a

9    nonsurgical subspecialty of ophthalmology because she is female"; (2) "another attending

10   physician ridiculed her for stating her intent to go into vitreoretinal surgery (a male-

11   dominated subspecialty) and stated that pediatric ophthalmology would be a better fit

12   because she is female"; and (3) "Dr. Holmes pressured [Plaintiff] on multiple occasions to

13   choose pediatric ophthalmology because she is a female, despite her well-known intent to

14   go into vitreoretinal surgery." (*Id.* at 4–5; Doc. 2 at 3.) And, Plaintiff alleges, male

15   residents were not subjected to administrative leave or psychiatric evaluation for behavioral

16   issues, including sending threatening messages to a female senior resident, safety

17   complaints, and clinical deficiencies. (Doc. 1 at 5–6; Doc. 2 at 4.) On this record, the

18   Court finds Plaintiff is likely to succeed on the merits of this claim.

19                              **2.  Retaliation**

20        When a person has complained of sex discrimination and faces retaliation for those

21   complaints, she has a right of action for intentional sex-based discrimination. *Jackson*, 544

22   U.S. at 173–74. To prevail on a retaliation claim under Title IX, the Court applies the

23   framework used to decide retaliation claims under Title VII. *Emeldi v. Univ. of Or.*, 698

24   F.3d 715, 724 (9th Cir. 2012). Under this framework, a plaintiff who lacks direct evidence

25   of retaliation must first make out a prima facie case of retaliation by showing (1) she was

26   engaged in protected activity, (2) she suffered an adverse action, and (3) there was a causal

27   link between the two. *Id.*

28        Plaintiff correctly asserts she was engaged in protected activity when she

complained to Program faculty regarding her exclusion from surgical training opportunities in favor of male residents.  *See Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1121 (9th Cir. 2023) ("In the Title IX context, speaking out against sex discrimination is protected activity.").  And, as Plaintiff alleges, she suffered adverse action when, after reporting specific instances of gender discrimination, she was forced to take administrative leave and undergo behavioral health evaluations.  *See Emeldi*, 698 F.3d at 726 (noting an action is adverse when "a reasonable person would have found the challenged action materially adverse," such that it would "dissuade[] a reasonable person from making or supporting a charge of discrimination" (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (cleaned up))).  Plaintiff also received negative evaluations on professionalism and interpersonal nonclinical communications from Defendants Altenbernd and Holmes and was ultimately dismissed from the Program.  *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (finding adverse action when an employee received undeserved poor performance ratings); *Grabowski*, 69 F.4th at 1121 (finding plaintiff's scholarship cancellation and dismissal from athletic team constituted an adverse action).  Plaintiff had previously received only positive feedback in these areas.  (Doc. 1 at 5.)

Plaintiff has demonstrated a causal link between her reports of gender discrimination and these adverse actions.  "We construe the causal link element of the retaliation framework broadly; a plaintiff merely has to prove that the protected activity and the adverse action are not completely unrelated."  *Grabowski*, 69 F.4th at 1122 (quoting *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 869 (9th Cir. 2014) (internal quotation marks omitted)).  Plaintiff points to the timing of several of the adverse actions in relation to her complaints of gender discrimination.  *See id.* ("[P]roximity in time between the protected action and the alleged retaliatory decision can provide circumstantial evidence of causation.").  According to Plaintiff, she was placed on administrative leave the same day she first reported gender discrimination to Defendant Altenbernd in June 2023 and was again placed on administrative leave in January 2024 after raising concerns

1   about gender discrimination. (Doc. 2 at 13.) And, within days of raising her fear the

2   probation terms offered in lieu of dismissal "would allow the Program Director to retaliate

3   against her for reports of discrimination by giving her a negative evaluation," Plaintiff was

4   dismissed from the Program. (Doc. 2 at 14.) Therefore, the Court finds Plaintiff has shown

5   she is likely to prevail on the merits of this claim.

6                          **B.  Irreparable Harm**

7         "An irreparable harm is one that cannot be redressed by a legal or equitable remedy

8   following trial." *Optinrealbig.com LLC v. Ironport Sys., Inc.*, 323 F. Supp. 2d 1037, 1051

9   (N.D. Cal. 2004). Courts will not grant relief "based only on a possibility of irreparable

10  harm," *Winter*, 555 U.S. at 22, and a plaintiff must instead show immediate threatened

11  harm, *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988)

12  ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a

13  preliminary injunction."). Beyond showing likely irreparable injury, a plaintiff must also

14  establish a "sufficient causal connection" between the harm and the conduct she seeks to

15  enjoin. *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 982 (9th Cir. 2011).

16        The loss of opportunity to pursue one's chosen profession due to alleged

17  discrimination is widely recognized as constituting an irreparable injury. *See, e.g.*, *Enyart*

18  *v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1165–66 (9th Cir. 2011) (Plaintiff

19  "demonstrated irreparable harm in the form of the loss of opportunity to pursue her chosen

20  profession. . . . If she fails the Bar Exam or scores too low on the MPRE to qualify for

21  admission, [she] cannot be licensed to practice law in California."); *Maczaczyj v. State of*

22  *New York*, 956 F. Supp. 403, 408 (W.D.N.Y. 1997) (finding exclusion from masters

23  program "will most likely affect plaintiff's ability to engage in the future employment of

24  his choice"); *see also Tanner v. Fed. Bureau of Prisons*, 433 F. Supp. 2d 117, 125 (D.D.C.

25  2006) ("The loss of specific job opportunities, training and competitive advantages can

26  constitute irreparable harm." (citing *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 89 n.16

27  (1981))). While purely economic harms that may later be compensated monetarily are not

28  irreparable, "[t]he lost opportunity to engage in one's preferred occupation goes beyond

1    monetary deprivation." *Bonnette v. D.C. Court of Appeals*, 796 F. Supp. 2d 164, 186

2    (D.D.C. 2011). Lost eligibility and opportunity to compete is a cognizable and irreparable

3    harm in and of itself. *See Tanner*, 433 F. Supp. 2d at 125 (finding loss of eligibility to

4    participate in vocational training program irreparable, though the benefits of participation

5    itself and any job opportunities to be derived therefrom were too speculative).

6        While a plaintiff's delay is not alone determinative in assessing whether she will be

7    irreparably harmed, it still "weighs against the immediacy of the harm." *AK Metals, LLC*

8    *v. Norman Indus. Materials, Inc.*, 2013 WL 417323, at *10 (S.D. Cal. Jan. 31, 2013) (two-

9    month delay); *see Oakland Trib., Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir.

10   1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of

11   urgency and irreparable harm."). Here, Plaintiff was dismissed from the Program on June

12   26, 2024. The dismissal was subsequently reversed, and Plaintiff was scheduled to return

13   to the Program on September 1, 2024, before her reinstatement conditioned upon a term of

14   probation was rescinded. Plaintiff acknowledges her delay in requesting injunctive relief

15   "weigh[s] against irreparable harm," explaining her initial counsel "failed to recognize"

16   her Title IX claim. (Doc. 2 at 16.)

17       Plaintiff nevertheless argues she will suffer irreparable harm without the Court's

18   intervention because "[n]o amount of money could sufficiently compensate [her] for the

19   dismissal from her final year of residency." (Doc. 2 at 14.) She claims it is "impossible"

20   to find an opening in a residency program for a fourth-year student like herself and "cannot

21   begin another four [year] program anew, even if she could find" one. (*Id.*) Plaintiff asserts

22   "any further delay in returning to her Program will result in significant training gaps that

23   will impair ability to continue her education in a fellowship program." (*Id.* at 15.)

24   Specifically, she argues her "training includes technical surgical skills that she must

25   practice regularly" and "will have to explain any training gaps to any fellowship program"

26   she will attend following residency. (*Id.*) Moreover, Plaintiff argues, she should be

27   permitted to return to the Program without probationary status because the harm and

28   resulting damage to her "professional reputation by having a permanent disciplinary action

1   (probation or dismissal) on her residency record" poses an "insurmountable barrier" to

2   "highly competitive vitreoretinal surgery fellowship positions." (*Id.* at 15–16.)

3          The Court agrees the denial of Plaintiff's TRO Motion will likely cause her

4   irreparable harm.  Plaintiff's dismissal from the Program effectively denies her the benefit

5   of the work already performed in her fourth year of residency and will delay or prevent her

6   completion of the Program.  And, although Plaintiff has already been dismissed from the

7   Program, her dismissal, or, alternatively, her placement on probation, will appear on her

8   record, which will impact her ability to enroll at another institution or her future career

9   possibilities. *See Doe v. Pa. State Univ.*, 276 F. Supp. 3d 300, 302 & n.1, 306, 315 (M.D.

10  Pa. 2017) (finding student in a seven-year pre-med program temporarily barred from

11  participating after another student accused him of sexual assault would be irreparably

12  harmed by two-year suspension gap as "he would forever be forced to explain his lengthy

13  tenure within this program and, ultimately, his delayed entry in the professional

14  workforce").  Indeed, if Plaintiff is not permitted to return to the Program without

15  probationary status pending resolution of her claims, she will, in all likelihood, be

16  prevented from becoming a vitreoretinal fellow or surgeon.  Plaintiff's continued

17  enrollment in the Program after over two months of administrative leave in early 2024, as

18  well as Defendants' proposed reinstatement of Plaintiff nearly three months after her

19  dismissal, suggest Plaintiff's temporary absence will not prevent her from catching up on

20  missed clinical hours and assignments.  Despite Plaintiff's delay in seeking injunctive

21  relief, the Court finds this factor weighs in favor of granting the TRO Motion.

22              **C.  Balance of Equities and Public Interest**

23          Plaintiff asserts the harm in delaying her completion of her final year of residency

24  "far outweighs any damage that the University could possibly conceive," asserting her

25  readmission does not "pose any harm to the Program or patients." (Doc. 2 at 16.)  Further,

26  she argues, public policy favors her reinstatement because (1) it will "encourage other

27  students to report . . . discrimination"; (2) it will allow her to continue "provid[ing] her

28  diverse perspectives and mentorship to patients and . . . colleagues"; and (3) it will allow

1   her to continue to provide care in a "medically underserved area in Southern Arizona." (*Id.*
2   at 17.)

3     "[U]pholding the goals of Title IX" is in the public interest. *Mayerova v. E. Mich.*
4   *Univ.*, 346 F. Supp. 3d 983, 999 (E.D. Mich. 2018); *see also Ollier v. Sweetwater Union*
5   *High Sch. Dist.*, 858 F. Supp. 2d 1093, 1115 (S.D. Cal. 2012) ("The public interest in
6   remedying gender discrimination is strong and promoting compliance with Title IX is an
7   important societal value."). Although it is also in the public's interest for university
8   officials to be afforded some level of deference in their decisions and processes, there is no
9   evidence Defendants will be harmed by allowing Plaintiff to remain in the Program
10  pending resolution of her claims. *See Doe v. Horne*, 683 F. Supp. 3d 950, 976 (D. Ariz.
11  2023) ("[A] preliminary injunction would not harm Defendants because it would merely
12  maintain the status quo while Plaintiffs pursue their claims." (alteration in original)
13  (citation omitted)); *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (finding
14  defendants "cannot suffer harm from an injunction that merely ends an unlawful practice").
15  According to Plaintiff, she has "never received a patient complaint or made a mistake
16  detrimental to patient care," and she had not received any negative evaluations regarding
17  professionalism and interpersonal communications prior to her reports of gender
18  discrimination. (Doc. 1 at 3; Doc. 2 at 12.) The Court finds these factors weigh in favor
19  of granting Plaintiff's TRO Motion.

20  **V.    CONCLUSION**

21    Based on the information the Court has before it, the Court finds a temporary
22  restraining order is warranted. Accordingly,

23    **IT IS ORDERED** Plaintiff's TRO Motion (Doc. 2) is **GRANTED**.

24    **IT IS FURTHER ORDERED** Plaintiff shall be reinstated in the Program without
25  probationary status effective immediately.

26    **IT IS FURTHER ORDERED** this TRO shall expire on **Tuesday, November 19,**
27  **2024, at 4:00 p.m.** unless extended by the Court for good cause.

28    . . . .

1      **IT IS FURTHER ORDERED** Defendants must show cause in writing why a

2   preliminary injunction should not issue no later than **Tuesday, November 12, 2024**.  If

3   Defendants file a Response to Plaintiff's TRO Motion by this date, the Court will set an

4   evidentiary hearing on whether to convert the TRO to a preliminary injunction.

5          Dated this 5th day of November, 2024, at 4:00 p.m.

6

7

8                                                 Honorable Scott H. Rash

9                                                 United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28